| IN THE MATTER OF THE SEARCH OF THE RESIDENCE LOCATED AT 311 HEDGEWOOD DRIVE APT. 4 CHATTANOOGA, TN - LOCATED ON THE SECOND STORY OF THE LEFT SIDE OF THE STRUCTURE IF FACING THE RESIDENCE FROM THE STREET, THE RESIDENCE ASSOCIATED WITH ARTHUR VALLEY. | Case No. 1:19-MJ- 110<br><br>Filed Under Seal |
|---|---|

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

This Affiant, Adam Baldwin, Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, states the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I, Adam Baldwin, am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been so employed since August 2014. In addition to my employment with ATF, I have over three years of law enforcement experience with the Pentagon Force Protection Agency (PFPA). During my tenure with PFPA, I served two years as a police officer in multiple capacities, to include patrol, surveillance detection, and as a law enforcement liaison to the Director of PFPA. I additionally served approximately one year as a special agent with PFPA, conducting complex criminal and protective intelligence investigations, as well as conducting domestic and international protective missions. I am a graduate of the Federal Law Enforcement Training Center (FLETC) Uniformed Police Training Program (UPTP), Criminal Investigator Training Program (CITP), and the ATF Special Agent Basic Training (SABT) Program. I have received specialized training with

1

respect to narcotics and firearms violations and have been involved in numerous investigations involving violent crimes and the seizure of firearms and controlled substances. I also have a Bachelor of Science in Criminal Justice from East Tennessee State University and a Master of Science in Criminal Justice from The University of Tennessee at Chattanooga.

2. This affidavit is submitted in support of an application for a search and seizure warrant of the residence and premises located at the following location: 311 Hedgewood Drive Apt. 4 Chattanooga, TN – the apartment located on the 2nd floor on the left side of the structure if facing the residence from the street – the residence of Arthur "Frank" VALLEY (hereinafter VALLEY). Information contained in this affidavit has been obtained through observations by your Affiant, interviews with fellow law enforcement officers, and an ATF Confidential Informant (CI). Not every fact known to your Affiant regarding the case has been included in the affidavit. Your Affiant has only included information and facts needed for the court to make a finding of probable cause.

3. Based upon your Affiant's training and experience and participation in investigations involving controlled substances, your Affiant knows that when controlled substances are illegally used, manufactured, and trafficked, other supporting items and materials are usually present in addition to the controlled substances themselves. These supporting items commonly associated with the use of and trafficking of controlled substances include, but are not limited to: drug paraphernalia, scales, and packaging materials suitable for particular substance(s), records and notes (including computer and electronically stored) of controlled substance transactions, money (proceeds of or capital for controlled substance(s)

transactions), firearms kept for protection, stolen property (often traded for controlled substances), electronic devices suitable for use in controlled substance transactions, recordings of such transactions, or electronic devices suitable for avoiding law enforcement.

4. It is also common for traffickers of these substances to use electronic communication devices such as cellular telephones, pagers, both numeric and two-way, and computers so that they can conduct their business at virtually any time without unnecessary delay. Your Affiant knows that these devices are usually found on or in very close proximity to these persons and that such electronic devices are capable of storing information such as phone numbers and/or coded messages which may lead to the identity of codefendants, coconspirators, and/or sources of supply. Cellular phones, phone records, device purchase agreements and other related documents related to the ownership are normally kept at their businesses, and/or places of operation. It is also common for them keep their electronic communication devices and cellular telephones in close proximity to themselves, on their person, in their vehicles, or at their business or place of operation. Cellular telephones, in addition to being communication devices, are also storage devices for data. Data electronically stored inside cellular telephones include telephone numbers of associates, logs of the date and time that individual calls were made, voice and text messages from associates and photographs of the primary user, family members and associates, location information, internet browsing history, calendar entries, task lists, contact information, and other similar data. The data inside cellular telephones is evidence of such sales activity, demonstrates true ownership and control of the telephones, which can be registered to another person, and can be effectively used to corroborate the statements of witnesses. With the advent of "smart

phones" all of the documents and information discussed within this section can be held on a smart phone in electronic format as well.

5. Based upon training and experience in conducting investigations involving controlled substances, your Affiant also knows that drug dealers, while utilizing electronic communication devices to conduct their business, will often use "slang," or "code words" when referring to their business activities. These code words may include reference to, but are not limited to, money, narcotics, other co-conspirators, and certain locations. Drug dealers use these code words in an attempt to conceal their illegal activities from law enforcement in an effort to avoid detection. Your Affiant is also aware that specific slang and code words utilized by those trafficking in controlled substances may be influenced by various factors such as geographical area, cultural influences, and the type of controlled substance being trafficked.

6. In your Affiant's training and experience, users of and traffickers in controlled substances, when hiding or transporting controlled substances or cash, commonly conceal them in several separate "stashes," often in several rooms of a building, outbuilding, vehicles, and in public or common areas which can be kept under their observation. Narcotics traffickers will also often place assets in names other than their own to conceal their assets from law enforcement.

7. Your affiant is aware that narcotics traffickers sometimes utilize multiple "stash locations" in an attempt to keep large quantities of controlled substances separate. Based on your Affiant's training and experience, your Affiant knows this to be done so that law enforcement cannot seize all of the controlled substance at one time if law enforcement is

alerted to the location of a single "stash location." This is also done in an attempt to secrete controlled substances from non-law enforcement personnel in an attempt minimize the potential of a robbery by individuals seeking to take possession of controlled substances during armed robberies, home invasions, or routine thefts.

8. It has also been your Affiant's training and experience that those who use or traffic in controlled substances, especially when law enforcement appears, will attempt to physically separate themselves from the controlled substances. They often do this by placing a controlled substance in a "neutral" location. They often employ intermediaries as couriers and drivers, to store drugs or conduct transactions. These intermediaries often include associates, but may also be extended to women, juveniles, or older people. Traffickers will use these individuals to transport controlled substances or otherwise assist the operation. These "mules" (as they are sometimes called) hold or transport the controlled substances or cash, allowing the dealer to stay "clean." Traffickers will also often "hand off" incriminating evidence to another person if confronted by law enforcement. In sum, these methods are used to attempt to insulate traffickers from risk of detection and apprehension by law enforcement.

9. Based upon your Affiant's training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841(a)(1) and 846 have been committed by VALLEY and known and unknown co-conspirators.

## PROBABLE CAUSE

10. Your Affiant is currently participating in an investigation of VALLEY for illegal drug trafficking and the illegal possession of firearms in the Eastern District of Tennessee (EDTN). An investigation conducted by the ATF Chattanooga Field Office has identified

VALLEY as operating in the EDTN, and being responsible for the illegal possession and distribution of firearms, heroin, and meth. The investigation was initiated by the development of information given by other law enforcement officers and an ATF CI. The information provided has been independently corroborated by your Affiant and other agents/officers as accurate. Furthermore, the CI has provided information to other law enforcement agencies that has led to the arrest of individuals involved in the illegal distribution of narcotics, as well as provided information that your Affiant has independently corroborated as accurate. Therefore, your Affiant submits the CI is reliable.

11. Throughout the course of the investigation into VALLEY, information was developed that identified VALLEY as a source of supply for heroin and meth throughout the EDTN. Specifically, in June 2019, an ATF CI advised your Affiant that VALLEY was actively involved in the distribution of large quantities of heroin and meth throughout the Chattanooga, TN area. The CI continued that VALLEY, whom the CI understood to be a convicted felon, was also known for frequently possessing firearms, as well as occasionally selling firearms and trading firearms for narcotics.

12. Based on the information provided by the CI, in June 2019, your Affiant began utilizing the CI to conduct controlled purchases of heroin and meth from VALLEY. To date, the CI has conducted at least three controlled purchases of heroin and meth from VALLEY, with two of the controlled purchases occurring at 311 Hedgewood Drive Apt. 4 Chattanooga, TN – the apartment located on the second story on the left side of the structure if facing the residence from the street (hereinafter referred to as VALLEY's RESIDENCE). The most recent purchase, which was for a resale amount of meth from VALLEY, occurred on June

26, 2019, in the EDTN from inside VALLEY's RESIDENCE. During each of the aforementioned controlled purchases, the following controls were put in place:

   a. Prior to each controlled purchase, under the direction and control of your Affiant, the CI met with your Affiant at a pre-determined location and was physically checked or searched by your Affiant or another law enforcement officer for any type of contraband.

   b. The CI was provided with official government funds to purchase narcotics from VALLEY.

   c. The CI was outfitted with an audio listening device, which was monitored by your Affiant or another law enforcement officer during each controlled purchase.

   d. Law enforcement maintained a constant visual of the CI and his/her vehicle from the pre-buy location to the predetermined buy location for each narcotics purchase.

   e. Following each controlled purchase, the CI was surveilled by your Affiant and law enforcement assisting with the operation to a pre-determined location, where law enforcement immediately retrieved narcotics and the audio listening device from the CI.

   f. A constant visual of the CI was maintained at all times. The CI was additionally searched or checked for contraband by your Affiant or another law enforcement officer following each controlled purchase.

## CONTROLLED PURCHASES FROM VALLEY

### June 12, 2019 Buy from VALLEY

13. On or about June 12, 2019, your Affiant met with the CI at a predetermined location for the purpose of conducting a controlled purchase of heroin and meth from VALLEY. Once at the pre-buy location, the CI advised your Affiant that he/she had spoken with VALLEY earlier that day, at which time VALLEY agreed to sell the CI a specified amount of heroin and meth at a specified price. Based on your Affiant's training and experience, the amount of heroin and meth agreed upon is consistent with a resale amount of narcotics. Following the receipt of information from the CI, the CI, in the presence of your Affiant, placed a recorded telephone call to VALLEY for the purpose of arranging the drug transaction. During the telephone call, VALLEY stated that prior to conducting the narcotics transaction with the CI, he would have to "run back to the crib where everything is at," and that he "had to go back to Red Bank to get it." Prior to terminating the call, VALLEY further stated that the "boy" is the "shit that's killing people." Following the call, VALLEY and the CI agreed to meet at a predetermined location for the narcotics transaction.

14. VALLEY's RESIDENCE is located in the Red Bank suburb of Chattanooga. Therefore, based on VALLEY's aforementioned statements about having to "go to Red Bank to get it," and that "everything" is at the "crib," it is understood by your Affiant that VALLEY was referencing traveling to VALLEY's RESIDENCE to obtain the narcotics in order to conduct the controlled purchase with the CI. Furthermore, based on training and experience, your Affiant knows that "boy," is "code," or "slang," commonly used by those trafficking in controlled substances to be in reference to heroin. Therefore, it is understood by your Affiant

that VALLEY's statement of "shit that's killing people," while discussing "boy" with the CI, was VALLEY stating that he is aware that the heroin he is distributing is killing people.

15. Upon departing the pre-buy location, the CI was surveilled by law enforcement to the predetermined buy location, where the CI parked his/her vehicle in the parking lot and remained in his/her vehicle. Shortly before the CI's arrival at the predetermined buy location, law enforcement conducting surveillance in the area of VALLEY's RESIDENCE observed VALLEY's vehicle drive down Hedgewood Drive away from his residence. VALLEY was subsequently surveilled directly to the predetermined buy location. Once VALLEY parked his vehicle, the CI exited his/her vehicle, walked to VALLEY's vehicle, and entered the passenger's side of the vehicle. Several seconds later, the CI returned to his/her vehicle and departed the buy location en route to the post-buy location. VALLEY also departed the buy location in his vehicle, and was surveilled directly back to Hedgewood Drive, where he was last observed traveling in the direction of VALLEY's RESIDENCE.

16. Once the CI returned to the post-buy location, law enforcement retrieved the previously agreed-upon amount of heroin and meth from the CI. The CI also confirmed that VALLEY was the only individual inside the vehicle.

### June 18, 2019 Controlled Buy from VALLEY

17. On or about June 18, 2019, your Affiant met with the CI at a predetermined location for the purpose of conducting a controlled purchase of heroin and meth from VALLEY. Once at the pre-buy location, the CI advised your Affiant that he/she had spoken with VALLEY earlier that day, at which time VALLEY agreed to sell the CI a specified amount of heroin and meth at a specified price from VALLEY's RESIDENCE. Based on your Affiant's

training and experience, the amount of heroin and meth agreed upon is consistent with a resale amount of narcotics. Following the receipt of information from the CI, the CI, in the presence of your Affiant, placed a recorded telephone call to VALLEY for the purpose of arranging the drug transaction. During the telephone call, VALLEY and the CI agreed to meet at VALLEY's RESIDENCE for the narcotics transaction. VALLEY also instructed the CI to "pull around back" when the CI arrived. Based on VALLEY's statement, the CI understood VALLEY to be instructing him/her to meet behind VALLEY's RESIDENCE for the drug deal.

18. Upon departing the pre-buy location, the CI was surveilled by law enforcement directly to VALLEY's RESIDENCE, where the CI parked his/her vehicle in a parking lot behind the residence. Several seconds later, the CI departed VALLEY's RESIDENCE en route to the post-buy location. Once the CI returned to the post-buy location, law enforcement retrieved the previously agreed-upon amount of heroin and meth from the CI. The CI also confirmed that VALLEY walked from VALLEY's RESIDENCE directly to the CI's vehicle to conduct the narcotics transaction. Following the drug deal, the CI observed VALLEY walk directly back to VALLEY's RESIDENCE.

### June 26, 2019 Controlled Buy from VALLEY

19. On or about June 26, 2019, your Affiant met with the CI at a predetermined location for the purpose of conducting a controlled purchase of meth from VALLEY. Once at the pre-buy location, the CI advised your Affiant that he/she had spoken with VALLEY the previous day, at which time VALLEY agreed to sell the CI a specified amount of meth at a specified price

from VALLEY's RESIDENCE. Based on your Affiant's training and experience, the amount of meth agreed upon is consistent with a resale amount of narcotics.

20. Upon departing the pre-buy location, the CI was surveilled by law enforcement directly to VALLEY's RESIDENCE, where the CI parked his/her vehicle in a parking lot behind the residence. Once the CI parked his/her vehicle, the CI was observed walking into VALLEY's residence with VALLEY. Several seconds later, the CI returned to his/her vehicle and departed VALLEY's RESIDENCE en route to the post-buy location.

21. Once the CI returned to the post-buy location, law enforcement retrieved the previously agreed-upon amount of meth from the CI. The CI also confirmed that VALLEY retrieved the narcotics from inside VALLEY's RESIDENCE to sell to the CI.

### Additional Investigative Activity

22. In addition to controlled purchases of heroin and meth from VALLEY, your Affiant obtained a Federal search warrant for text message content for VALLEY's cellular number utilized by VALLEY to orchestrate the aforementioned controlled purchases. During a review of the messages, which were from June 14, 2019 through June 19, 2019, numerous messages were reviewed during which, based on your Affiant's training and experience, were indicative of VALLEY distributing meth and heroin. Specifically, your Affiant reviewed numerous messages during which VALLEY discussed the distribution of "clear" and "boy." As previously stated in this affidavit, your Affiant knows, based on training and experience, as well as information obtained throughout this investigation, that "clear" is code, or slang, frequently utilized by those distributing narcotics to refer to meth, while "boy" is frequently used to refer to heroin. Furthermore, on at least two separate days during the aforementioned

11

text message review period, VALLEY states that he is "good," and that he's "re-upped," or is "up." Your Affiant knows, based on training and experience, that such language is consistent with a supplier of narcotics advising his/her distributors that he/she has obtained more narcotics to sell, as "re-up" and "up" are typically used to refer to a supplier's status regarding the amount of narcotics available for distribution. Such language is also consistent with information provided by the CI to your Affiant that VALLEY will "re-up" approximately two times per week in order to have a consistent amount of narcotics for distribution.

23. Furthermore, the CI stated that on or about July 5, 2019, VALLEY informed the CI that he/she had additional heroin for sale, and instructed the CI to contact him "whenever" he needs additional narcotics.

24. Database checks also confirmed VALLEY is currently on felony probation in the State of TN for a felony narcotics offense. Tennessee Probation and Parole also confirmed that VALLEY's RESIDENCE is also listed as his residence with his probation officer.

25. Based on the information obtained throughout the course of the investigation, to include, but not limited to, the controlled purchases, text message content review, and information provided by the CI, your Affiant submits that VALLEY is involved in the ongoing distribution of narcotics, specifically meth and heroin. Your Affiant also submits that, based on the aforementioned information, that VALLEY utilizes VALLEY's RESIDENCE as a primary storage and distribution location for his narcotics and is continuing to do so. Therefore, your Affiant submits that additional evidence of VALLEY's ongoing involvement in the distribution of heroin and meth is located at VALLEY's RESIDENCE.

26. WHEREFORE, based upon the facts detailed above, together with your Affiant's training and experience in drug trafficking investigations, your Affiant believes and submits there is probable cause to believe that the premises located at 311 Hedgewood Drive Apt. 4 Chattanooga, TN – the apartment located on the left side of the second story of the structure if facing the residence from the street, including the residence, outbuilding, vehicle(s), and curtilage located herein described will contain evidence of drug trafficking, particularly of heroin, in violation of Title 21, United States Code, Section 841 and Title 21, United States Code, Section 846. These fruits, evidence and instrumentalities of crimes against the United States of America are described with particularity in Attachment B.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully submitted,

_____
Adam Baldwin
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives (ATF)

Sworn to and subscribed before me
this __10TH__ day of July 2019.

_____
Christopher H. Steger
United States Magistrate Judge